**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

LOGARO LLC,

    Plaintiff,

  v.

ANKOMINA; AWDAIEW; BAOSHIMY-US; BESTOMZ; BOGIEGO; BYEANMALL66; CAMMY SHENGLI; CEIATHER; CHENSHOUQUAN111; CHIIXIERA; CONCELERY; CXCTCT; DASCOCO; DEAYOU; DONGGUANSHIJIAOQIONGMAOYI; DONGXEAN; DUWEN76; DWELLWELLES; EARTIM; ENSHISHIWUPENGDIANZISHANGWUYOUXIANGONGSI; FUXINWENJUYOUXIANGONGSI; GALAYESTAR; GRAETION; GRGHSG; GUANGZHOUJIATONGKEJIYOUXIANGONGSI; GUANGZHOUYAOCIKEJIYOUXIANGONGSI; HIGH FUN; HILSAYUM; HL·MILEAGE; HONGHENGWANLI; HSSLWRAN-US; HWDJISW; INGRID GL; ITECHPANDA; JIAJUGUIFU; JIAQWEW; JINANJUANQIFUSHANGMAOYOUXIANGONGSI; JINGTU HOME; JIUSHUANG; KEAIDUOA; KEROPRINS; KNOLL SEAL; KUAILEBEIMAOYIYOUXIANGONGSI; LHAIYAN; LIECHEANRY; LINUYA; LIUQUEI; LXIAOHD3; MAGWEN226; MALLMALL6; MODANGSM; MULOSU; NANCELELOR; NISHUNA; OHYONJON; QDNANH; QIANYOUJIE; QUANHATANG; QUNLAID; RUIZIENG;

Case No.

SHENZHENSHIYUHAIDIANZIKEJIYOUXIANGONGSI; SHOUTTING; SI PEIHONG; SUNNTONSTORE; TAIYUANYINLIANMAOYIYOUXIANGONGSI; TINIME-US; TONGMMMPP2; TRIPLE SIX; TRYTOALWEST; TVOVO; US-ZHNGJIUYUAN; VELTEC; WANGSHANGGOU; WANHUI89; WM.KNITTER; WONDERFULCHOICE616; XINGFENGSHANGMAOYOUXIANGONGSI; XINSHW; XURAN2021; XUYAID; XUYOULIN; YAHPETES; YEZININHAO; YIHANDIANZI666; YIIISTONE; YIMOCHI; YONGSTORENA; YPINGP; ZKWLXS; ZRIPOOL; 昆明胡永储讯网络科技有限公司; and 月鹏商贸,

Defendants.

**Complaint**

**NOW COMES** Logaro LLC ("Plaintiff"), by and through its undesigned counsel and hereby brings its case against ANKOMINA, awdaiew, BAOSHIMY-US, BESTOMZ, BogieGo, Byeanmall66, Cammy Shengli, Ceiather, ChenShouQuan111, Chiixiera, Concelery, CXCTCT, Dascoco, DEAYOU, dongguanshijiaoqiongmaoyi, DongXean, Duwen76, DwellWelles, Eartim, enshishiwupengdianzishangwuyouxiangongsi, fuxinwenjuyouxiangongsi, Galayestar, Graetion, GRGHSG, guangzhoujiatongkejiyouxiangongsi, guangzhouyaocikejiyouxiangongsi, High Fun, Hilsayum, HL·Mileage,

2

honghengwanli, HssLwran-US, hwdjiSW, Ingrid GL, itechpanda, JIAJUGUIFU, JIAQWew, JiNanJuanQiFuShangMaoYouXianGongSi, JINGTU HOME, jiushuang, keaiduoa, Keroprins, Knoll Seal, kuailebeimaoyiyouxiangongsi, LHAIYAN, Liecheanry, Linuya, LIuquei, Lxiaohd3, Magwen226, MALLMALL6, ModangSM, Mulosu, Nancelelor, Nishuna, OHYONJON, QDnanh, Qianyoujie, Quanhatang, QUnlaid, Ruizieng, Shenzhenshiyuhaidianzikejiyouxiangongsi, SHOUTTING, Si Peihong, SUNNTONSTORE, taiyuanyinlianmaoyiyouxiangongsi, tinime-us, TongMMMpp2, Triple six, TrytoalWest, Tvovo, US-ZHNGJIUYUAN, Veltec, wangshanggou, Wanhui89, Wm.Knitter, Wonderfulchoice616, xingfengshangmaoyouxiangongsi, XInshw, XURAN2021, XUyaid, Xuyoulin, Yahpetes, YEZININHAO, YIHANDIANZI666, YIIISTONE, YIMOCHI, Yongstorena, YPIngp, ZKWLXS, Zripool, 昆明胡永储讯网络科技有限公司, and 月鹏商贸 (collectively, "Defendants"), and alleges as follows:

## Introduction

1. This action has been filed by Plaintiff to combat e-commerce store operators who trade upon Plaintiff's reputation and goodwill by offering for sale and/or selling Counterfeit Products. Defendants create e-commerce stores operating under one or more identified above ("Seller Aliases") which are advertising, offering for sale, and selling products using infringing and/or counterfeit

3

versions of the federally registered trademarks owned and/or licensed by Plaintiff (collectively, the "Counterfeit Products") to unknowing consumers here in the United States. E-commerce stores operating under the Seller Aliases share characteristics establishing a logical relationship between them, and Defendants' unlawful activities arise out of the same transaction, occurrence, or series of transactions or occurrences. Defendants attempt to avoid, or at least mitigate, liability by operating under one or more Seller Aliases to conceal both their identities and the full scope and interworking of their counterfeiting operation. Plaintiff is forced to file this action to combat Defendants' counterfeiting of its registered and trademarks, as well as to protect unknowing consumers from mistakenly purchasing Counterfeit Products over the Internet. Plaintiff has been and continues to be irreparably damaged through consumer confusion, a lack of quality control, and a loss of brand confidence, exclusivity, and unquantifiable future sales as a result of Defendants' actions and seeks injunctive and monetary relief.

**Jurisdiction and Venue**

2. This Court has original subject matter jurisdiction over the claims in this action pursuant to the provisions of the Lanham Act, 15 U.S.C. § 1051, et seq., 28 U.S.C. §§ 1331, 1338(a)-(b).

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391, and this Court may properly exercise personal jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2) over Defendants since each of the Defendants directly targets business activities toward consumers in the United States, through at least the fully interactive e-commerce stores operating under the seller aliases identified above (the "Seller Aliases"). Specifically, Defendants have targeted sales to United States residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, accept payment in U.S. dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Products to residents in the United States.

**Parties**

4. Plaintiff is a Chinese limited company.

5. Plaintiff is a purveyor of various products and is responsible for the Crystal3 brand. Plaintiff markets, advertises, offers for sale, and sells select products under the Crystal3 brand, including ink pad products (collectively, "Genuine Crystal3 Products").

6. The Crystal3 brand has enjoyed success in international e-commerce. Plaintiff's ink pad products are available for sale online.

7. Plaintiff applied for and holds the U.S. trademark registration for Crystal3 (the "Crystal3 Trademark").

| Reg. No. | Trademark | Goods / Services |
|---|---|---|
| 7,461,035 | *Crystal* | CLASS 16: Ink pads; Ink pads for seals |

8. A true and correct copy of the U.S. Registration Certificate is attached hereto as **Exhibit 1**.

9. The above U.S. registration for the Crystal3 Trademark is valid, subsisting, and in full force and effect.

10. The registration for the Crystal3 Trademark constitutes *prima facie* evidence of its validity and of the exclusive right to use the Crystal3 Trademark pursuant to 15 U.S.C. § 1057(b).

11. The Plaintiff Trademark signifies to the purchaser that Genuine Crystal3 Products come from Plaintiff are manufactured to Plaintiff's quality standards. Plaintiff ensures that products bearing the Crystal3 Trademark are manufactured to the highest quality standards.

12. The Crystal3 Trademark has been continuously used and never abandoned. The innovative marketing of the Genuine Crystal3 Products has enabled the brand to

achieve widespread recognition. This widespread recognition and significant goodwill have made the Crystal3 Trademark a valuable asset of Plaintiff.

13. Plaintiff has expended significant resources in advertising, promoting, and marketing featuring the Crystal3 Trademark. As a result, products bearing the Crystal3 Trademark are widely recognized and exclusively associated by consumers, the public, and the trade as being high-quality products sourced from Plaintiff. Genuine Crystal3 Products have become among the most popular ink pad products on the market. As such, the goodwill associated with the Crystal3 Trademark is of incalculable and inestimable value to Plaintiff and Plaintiff has made efforts to protect its interests in and to the Crystal3 Trademark.

### The Defendants

14. Defendants are individuals and business entities of unknown makeup who own and/or operate one or more of the e-commerce stores under at least the Seller Aliases identified above and/or other seller aliases not yet known to Plaintiff. On information and belief, Defendants reside and/or operate in the People's Republic of China or other foreign jurisdictions with marginal trademark enforcement systems or redistribute products from the same or similar sources in those locations. Defendants have the capacity to be sued pursuant to Federal Rule of Civil Procedure 17(b).

15. On information and belief, Defendants, either individually or jointly, operate one or more e-commerce stores under the Seller Aliases listed above. Tactics used by Defendants to conceal their identities and the full scope of their operation make it virtually impossible for Plaintiff to discover Defendants' true identities and the exact interworking of their network. If Defendants provide additional credible information regarding their identities, Plaintiff will take appropriate steps to amend the Complaint.

<b>Defendant's Unlawful Conduct</b>

16. Marketplaces like Amazon allow merchants to quickly "set up shop" and flood the market with unauthorized goods which displace actual sales manufacturers would otherwise enjoy.

17. It has been estimated that e-commerce intellectual property infringement costs merchants in the U.S. alone nearly $41 billion[1] with Department of Homeland Security seizures of infringing goods increasing more than 10-fold between 2000 and 2018[2] and a street value of seized goods increasing 246% from 2017 to 2022.[3]

---

[1] The National Bureau of Asian Research, The Report of the Commission on the Theft of American Intellectual Property, at 9, Pub. The Commission on the Theft of American Intellectual Property 2017, available at https://www.nbr.org/wp-content/uploads/pdfs/publications/IP_Commission_Report.pdf, last accessed June 25, 2026

[2] U.S. Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods Report to the President of the United States*, January 24, 2020.

[3] U.S. Customs and Border Protection Office of Trade, *FY 2022 Fact Sheet Intellectual Property Rights*, available at https://www.cbp.gov/sites/default/files/assets/documents/2023-

8

18. U.S. Customs and Border Protection ("CBP") reported that for Fiscal Year 2023, 90% of all CBP intellectual property seizures were smaller international mail and express shipments (as opposed to large cargo containers) and 84% of CBP seizures originated from mainland China and Hong Kong.[4]

19. Infringing and pirated products account for billions in economic losses, resulting in tens of thousands of lost jobs for legitimate businesses and broader economic losses, including lost tax revenue.

20. Third party service providers or e-commerce platforms like those used by Defendants do not robustly subject new sellers to verification and confirmation of their identities, allowing infringers to "routinely use false or inaccurate names and addresses when registering with these e-commerce platforms."[5]

21. DHS has observed that "at least some e-commerce platforms, little identifying information is necessary for [an infringer] to begin selling" and recommending that "[s]ignificantly enhanced vetting of third-party sellers" is necessary. Infringers hedge against the risk of being caught and having their websites

---

Mar/IPR%20Fact%20Sheet%20FY2022%20Final%20Draft%20%28508%29%20%28004%29%20%282%29.pdf, last accessed June 25, 2026

[4] U.S. Customs and Border Protection Office of Trade, *Intellectual Property Rights Fiscal Year 2023 Seizure Statistics*, available at, https://www.cbp.gov/sites/default/files/2024-06/ipr-seizure-stats-fy23-508.pdf, last accessed June 25, 2026

[5] Daniel C.K. Chow, *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. 157, 186 (2020).

taken down from an e-commerce platform by preemptively establishing multiple virtual storefronts.[6]

22. Since platforms generally do not require a seller on a third-party marketplace to identify the underlying business entity, infringers can have many different profiles that can appear unrelated even though they are commonly owned and operated.[7]

23. Further, "E-commerce platforms create bureaucratic or technical hurdles in helping brand owners to locate or identify sources of [infringement]."[8]

24. The ability of e-commerce sellers to effectively hide their identities makes it very difficult for intellectual property enforcement and policing actions to be undertaken by Plaintiff because simply taking advantage of platform takedown procedures to remove infringing products would be an endless game of whack-a-mole. Sadly, a significant number of infringers have decided to trade upon Plaintiff's reputation, goodwill, and valuable copyrights by selling and/or offering for sale products in connection with the reproduction, distribution, and display of Plaintiff's imagery. The aggregated effect of the mass piracy that is taking place has overwhelmed Plaintiff and Plaintiff's ability to police

---

[6] *Combating Trafficking in Counterfeit and Pirated Goods Report to the President of the United States*, at p. 22.
[7] Id., at p. 39.
[8] *Alibaba, Amazon, and Counterfeiting in the Age of the Internet*, 40 NW. J. INT'L L. & BUS. at 186-187.

Plaintiff's rights against the many unknown defendants who are selling personal care products of unknown provenance.

25. A recent report from the U.S. Department of Homeland Security elaborated on the operation of cooperative pirating networks and the advantages such networks have over standalone retailers, noting that "counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks" and "[t]he ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers.[9]  The report also found that [t]he ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders" because it "allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked."[10]

26. Defendants have targeted sales to United States residents by setting up and operating e-commerce stores that target United States consumers using one or more Seller Aliases, offer shipping to the United States, accept payment in U.S.

---

[9] Department of Homeland Security, *Combating Trafficking in Counterfeit and Pirated Goods*, Jan. 24, 2020, at 10, available at https://www.dhs.gov/sites/default/files/publications/20_0124_plcy_counterfeit-pirated-goods-report_01.pdf, last accessed June 25, 2026.
[10] Id. at 5, 12.

dollars and/or funds from U.S. bank accounts and, on information and belief, have sold Counterfeit Products to residents of the United States.

27. Defendants concurrently employ and benefit from substantially similar advertising and marketing strategies. For example, many Defendants facilitate sales by designing the e-commerce stores (including product detail pages) operating under the Seller Aliases so that they appear to unknowing consumers to be authorized online retailers of their products (including Crystal3 Products), outlet stores, or wholesalers. E-commerce stores operating under the Seller Aliases look sophisticated and accept payment in U.S. dollars and/or funds from U.S. bank accounts via credit cards and Amazon Pay. E-commerce stores operating under the Seller Aliases often include content and images that make it very difficult for consumers to distinguish such stores from an authorized retailer of Genuine Crystal3 Products.

28. Plaintiff has not licensed or authorized Defendants to use the Crystal3 Trademark and on information and belief none of the Defendants are authorized retailers of Genuine Crystal3 Products.

29. Many Defendants deceive unknowing consumers by using the Crystal3 Trademark without authorization within the content and text of their e-commerce stores to attract various search engines crawling the Internet looking for webpages relevant to consumer searches for Genuine Crystal3 Products.

Other e-commerce stores operating under the Seller Aliases omit using the Crystal3 Trademark in the item title to evade enforcement efforts while using product photographs containing the Crystal3 Trademark that will trigger their listings when consumers are searching for Genuine Crystal3 Products.

30. E-commerce store operators like Defendants commonly engage in fraudulent conduct when registering the Seller Aliases by providing false, misleading, and/or incomplete information to e-commerce platforms to prevent discovery of their true identities and the scope of their e-commerce operation.

31. E-commerce store operators like Defendants regularly simultaneously multiple storefronts in violation of platform terms of service, or register or acquire new seller aliases for the purpose of offering for sale and selling Counterfeit Products. Such seller alias registration patterns are one of many common tactics used by e-commerce store operators like Defendants to conceal their identities and counterfeiting operation, and to avoid being shut down.

32. Even though Defendants operate under multiple fictitious aliases, the e-commerce stores operating under the Seller Aliases often share unique characteristics such as templates with common design elements which intentionally omit any contact information or other information for identifying Defendants or other seller aliases they operate or use. E-commerce stores operating under the Seller Aliases include other notable common features, such

13

as use of the same registration patterns, accepted payment methods, check-out methods, keywords, advertising tactics, similarities in price and quantities, the same grammatical and spelling errors, and/or the use of the same text and images. Additionally, Counterfeit Products for sale by the Seller Aliases bear similar irregularities and indicia of being counterfeit, suggesting that the Counterfeit Products were manufactured by and come from a common source and that Defendants are interrelated.

33. E-commerce store operators like Defendants are in constant communication with each other and regularly participate in QQ.com chat rooms and through websites such as sellerdefense.cn and kuajingvs.com regarding tactics for operating multiple accounts simultaneously, evading detection, pending litigation, and potential new lawsuits.

34. Counterfeiters such as Defendants will typically operate under multiple seller aliases and payment accounts so that they can continue operation despite the enforcement efforts of a rightsholders like Plaintiff. E-commerce store operators like Defendants maintain off-shore bank accounts and regularly move funds from their financial accounts to off-shore accounts outside the jurisdiction of this Court to avoid payment of any monetary judgment which might by award by rightsholders like Plaintiff. Indeed, analysis of financial account transaction logs from previous similar cases indicates that off-shore

14

counterfeiters regularly move funds from U.S.-based financial accounts to off-shore accounts outside the jurisdiction of this Court.

35. Upon information and belief, Defendants are working to knowingly and willfully import, distribute, offer for sale, and sell Counterfeit Products in the same transaction, occurrence, or series of transactions or occurrences. Defendants, without any authorization or license from Plaintiff, have knowingly and willfully used and continue to use the Crystal3 Trademark in connection with the advertisement, distribution, offering for sale, and sale of Counterfeit Products into the United States over the Internet.

36. Defendants' unauthorized use of the Crystal3 Trademark in connection with the advertising, distribution, offering for sale, and sale of Counterfeit Products, including the sale of Counterfeit Products into the United States is likely to cause and has caused confusion, mistake, and deception by and among consumers and is irreparably harming Plaintiff.

**Count I - Trademark Infringing and Counterfeiting (15 U.S.C. § 1114)**

37. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in Paragraphs 1 through 36.

38. Plaintiff's trademark infringement claims against Defendants are based on their unauthorized use in commerce of counterfeit imitations of the federally-

registered Crystal3 Trademark in connection with the advertising, distribution, offering for sale, and sale of infringing goods.

39. The Crystal3 Trademark is a distinctive mark, and consumers have come to expect superior quality from products advertised, distributed, offered, or sold under the Crystal3 Trademark.

40. Defendants have advertised, distributed, offered to sell, sold, and are still advertising, distributing, offering to sell, and selling products using counterfeit reproductions of the Crystal3 Trademark without Plaintiff's permission.

41. Plaintiff is the exclusive owner of the Crystal3 Trademark. Plaintiff's registration for the Plaintiff Trademark is in full force and effect.

42. Upon information and belief, Defendants are aware and have knowledge of Plaintiff's rights in the Crystal3 Trademark and are willfully infringing it and intentionally using counterfeit reproductions thereof.

43. Defendants' willful, intentional, and unauthorized use of the Crystal3 Trademark is likely to cause and is causing confusion, mistake, and deception as to the origin and quality of the Counterfeit Products among the general public.

44. Defendants' activities constitute willful trademark infringement and counterfeiting under 15 U.S.C. § 1114.

45. Plaintiff has no adequate remedy at all and will suffer irreparable harm to its reputation and goodwill of its well-known Crystal3 Trademark if Defendants' actions are not enjoined.

46. Defendants' wrongful advertisement, offering to sell, and sale of Infringing Products have directly and proximately caused injuries and damage to Plaintiff.

### Count II - False Designation of Origin (15 U.S.C. § 1125(a))

47. Plaintiff repeats, re-alleges, and incorporates by reference the allegations set forth in Paragraphs 1 through 46.

48. Defendants' advertising, distribution, offering for sale, and sale of Infringing Products has created and is creating a likelihood of confusion, mistake, and deception among the general public as to the affiliation, connection or association with Plaintiff or the origin, sponsorship, or approval of Defendants' Counterfeit Products by Plaintiff.

49. By using the Crystal3 Trademark in association with the advertising, distribution, offering for sale, and sale of the Counterfeit Products, Defendants create a false designation of origin and a misleading representation of fact as to the true origin and sponsorship of the Counterfeit Products.

50. Defendants' false designation of origin and misrepresentation of fact as to the origin and/or sponsorship of the Infringing Products to the general public

involves the willful use of counterfeit marks and is a willful violation of 15 U.S.C. § 1125.

51. Plaintiff has no adequate remedy at all and will suffer irreparable harm to its reputation and goodwill of its well-known Crystal3 Trademark if Defendants' actions are not enjoined.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

1) That Defendants, their affiliates, officers, agents, servants, employees, attorneys, confederates, and all persons acting for, with, by, through, under, or in concert with them be permanently enjoined and restrained from:

    a. Using the Crystal3 Trademark or any reproductions, counterfeit copies, or colorable imitations thereof in any manner in connection with the distribution, marketing, advertising, offering for sale, or sale of any product that is not a Genuine Crystal3 Product or is not authorized by Plaintiff to be sold in connection with the Crystal3 Trademark;

    b. passing off, inducing, or enabling others to sell or pass off any product as a Genuine Crystal3 Product or any other product produced by Plaintiff that is not Plaintiff's or is not produced under the authorization, control, or supervision of Plaintiff and approved by Plaintiff for sale using the Crystal3 Trademark;

c. committing any acts calculated to cause consumers to believe that Defendants' Counterfeit Products are those sold under the authorization, control, or supervision of Plaintiff, or are sponsored by, approved by, or otherwise connected with Plaintiff;

d. further infringing the Crystal3 Trademark and damaging Plaintiff's goodwill; and

e. manufacturing, shipping, delivering, holding for sale, transferring or otherwise moving, storing, distributing, returning, or otherwise disposing of, in any manner, products or inventory not manufactured by or for Plaintiff, nor authorized by Plaintiff to be sold or offered for sale, and which bear any of Plaintiff's trademarks, including the Crystal3 Trademark, or any reproductions, counterfeit copies, or colorable imitations thereof;

2) Entry of an Order that, upon Plaintiff's request, those with notice of the injunction, including, without limitation, any online marketplace platforms such as eBay, AliExpress, Alibaba, Amazon, Walmart, Wish.com, Etsy, Temu, TikTok, and DHgate (collectively, the "Third Party Providers") shall disable and cease displaying any advertisements used by or associated with Defendants in connection with the sale of counterfeit and infringing goods using the Crystal3 Trademark;

3) That Defendants account for and pay to Plaintiff all profits realized by Defendants by reason of Defendants' unlawful acts herein alleged, and that the amount of damages for infringement of the Crystal3 Trademark be increased by a sum not exceeding three times the amount thereof as provided by 15 U.S.C. § 1117;

4) In the alternative, that Plaintiff be awarded statutory damages for willful trademark counterfeiting pursuant to 15 U.S.C. § 1117(c)(2) of $2,000,000 for each and every use of the Crystal3 Trademark;

5) Plaintiff is further entitled to recover its attorneys' fees and full costs for bringing this action pursuant to 15 U.S.C. § 1117(a); and

6) Award any and all other relief that this Court deems just and proper.

Dated:      June 25, 2026

Respectfully submitted,

/s/Adam E. Urbanczyk
Adam E. Urbanczyk
(GA 094951)
AU LLC
444 W. Lake St. 17th Floor
Chicago, IL 60606
(312) 715-7312
adamu@au-llc.com
*Counsel for Plaintiff*